**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| TROLL COMMUNICATIONS, LLC, <u>et al.</u>, | ) | |
| | ) | Case Nos. 03-11508 through |
| | ) | 03-11516 (RB) |
| Debtors. | ) | |
| | ) | |
| MICHAEL B. JOSEPH, AS CHAPTER 7 | ) | |
| TRUSTEE FOR TROLL COMMUNICATIONS, | ) | |
| LLC, <u>et al.</u>, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 05-51605 (RB) |
| | ) | |
| LINCOLN E. FRANK, ANDREW E. KAPLAN, | ) | |
| PETER E. BERGEN, DANIEL NEUWIRTH, | ) | |
| CURTIS THOMPSON, JEFFREY LUCKING, | ) | |
| TERRY TUTTLE, SETH J. LEHR, | ) | |
| SCOTT PERRICELLI, QUAD VENTURE | ) | |
| PARTNERS SBIC, LP, QUAD VENTURE | ) | |
| PARTNERS, LP, AND QUAD VENTURES, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Michael B. Joseph, the Chapter 7 Trustee ("Plaintiff" ) for the above-captioned

bankruptcy estates, by his undersigned attorneys, as and for his Complaint against Defendants,

Lincoln E. Frank, Andrew E. Kaplan, Peter E. Bergen, Daniel Neuwirth, Curtis Thompson,

Jeffrey Lucking, Terry Tuttle, Seth J. Lehr, Scott Perricelli, Quad Venture Partners SBIC, LP,

Quad Venture Partners, LP, and Quad Ventures, LLC (collectively, the "Defendants"),

respectfully represents and alleges as follows:

## <u>INTRODUCTION</u>

The plaintiff brings this action on behalf of the bankruptcy estates of Troll Holdings, Inc. ("Holdings"), a wholly-owned subsidiary and co-debtor, Troll Communications, LLC ("Communications"), and Communications' wholly-owned subsidiaries and co-debtors, Troll Associates LLC, Troll Book Clubs, LLC, Troll Home Clubs, LLC, Troll Book Fairs, LLC, Troll School & Library LLC, Troll Realty, LLC and Troll Publishing LLC, each of which is a Delaware limited liability company ("Subsidiaries").

As set forth in greater detail below, the aforementioned defendants, all "insiders" of the debtors, as that term is defined in 28 U.S.C. §101, owing fiduciary duties to the debtors' unsecured creditors, were the directors, officers, managing members, and controlling shareholders of Holdings, Communications and Subsidiaries (collectively, "Troll" or "Troll Companies" or "debtors").  The gravamen of the breach of fiduciary duty count of this action is that the defendants had reasonably available and material financial information seriously doubting Troll's continued viability as a "going concern", and should have taken immediate corrective action to protect the interests of its unsecured creditors.  Instead, Troll's board of directors and/or managers artificially extended the financial life of Troll for their own improper benefit, and to the detriment of Troll's unsecured creditors.  The debtors filed voluntary petitions seeking bankruptcy protection under chapter 11 on May 16, 2003 (the "Petition Date").  This complaint primarily focuses on the time period between Quad's acquisition of Troll and the Petition Date.

In addition, the plaintiff sues under applicable bankruptcy and state law to avoid and recover insider preferential and fraudulent transfers between Troll and defendants Quad Venture

Partners, L.P. and Quad Ventures, LLC in an aggregate amount of not less than $4.3 million.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the parties and the claims set forth in this

adversary matter pursuant to 28 U.S.C. §§1331 and 1334(b), because this is a civil proceeding

arising under title 11 of the United States Code (the "Bankruptcy Code"), or arising in or related

to the above-captioned jointly administered chapter 7 cases under the Bankruptcy Code.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

3.      This is a non-core proceeding with respect to Count One and a

core proceeding under 28 U.S.C. §157(b)(2) with respect to Counts Two and Three.

## PARTIES

4.      Plaintiff, Michael B. Joseph, was duly appointed chapter 7 trustee ("Chapter 7

Trustee") of the debtors' bankruptcy estates on July 28, 2003, pursuant to chapter 7 of the

Bankruptcy Code.

5.      Defendant, Lincoln E. Frank ("Frank") was during the Relevant Insider Period

and, upon information and belief, President, CEO, VP and Treasurer of Holdings, Member of

Holdings' Board of Directors, VP and Treasurer of Communications, Member of

Communications' Board of Managers, President, CEO, and Treasurer of NewCo, VP and

Treasurer of all other Troll Subsidiaries, remains a Partner of Quad, and is a resident of New

York.

6.      Defendant, Andrew E. Kaplan ("Kaplan") was during the Relevant Insider Period

and, upon information and belief, VP and Assistant Secretary of Holdings, Member of Holdings'

Board of Directors, VP and Assistant Secretary of Communications, Member of

Communications' Board of Managers, VP and Assistant Secretary of NewCo, VP and Assistant Secretary of all other Troll Subsidiaries, remains a Partner of Quad, and is a resident of New Jersey.

7.     Defendant, Daniel Neuwirth ("Neuwirth") was during the Relevant Insider Period and, upon information and belief, VP and Secretary of Holdings, Member of Holdings' Board of Directors, VP and Secretary of Communications, Member of Communications' Board of Managers, VP and Secretary of all other Troll Subsidiaries, VP and Secretary of NewCo, remains a Partner of Quad, and is a resident of New York.

8.     Defendant, Peter E. Bergen ("Bergen") was during the Relevant Insider Period and, upon information and belief, President and CEO of Holdings, Member of Holdings' Board of Directors, President and CEO of Communications, Member of Communications' Board of Managers, President and CEO of all other Troll Subsidiaries, and is a resident of Connecticut.

9.     Defendant, Curtis Thompson ("Thompson") was during the Relevant Insider Period and, upon information and belief, COO, Secretary, and Treasurer of Holdings, COO of Communications, and COO of all other Troll Subsidiaries, and is a resident of New York.

10.     Defendant, Jeffrey Lucking ("Lucking") was during the Relevant Insider Period and, upon information and belief, CFO and Secretary of Communications, and Secretary of all other Troll Subsidiaries, and is a resident of New York.

11.     Defendant, Terry Tuttle ("Tuttle") was during the Relevant Insider Period and, upon information and belief, COO of Communications, and COO of all other Troll Subsidiaries, and is a resident of California.

12.     Defendant, Seth J. Lehr ("Lehr") was during the Relevant Insider Period and,

upon information and belief, a Member of Holdings' Board of Directors, remains a Partner of LLR, and is a resident of Pennsylvania.

13.     Defendant, Scott Perricelli ("Perricelli") was during the Relevant Insider Period and, upon information and belief, a Member of Holdings' Board of Directors, remains associated with LLR, and is a resident of Pennsylvania.

14.      Defendants, Quad Venture Partners SBIC, LP ("QVP SBIC") and Quad Venture Partners, LP ("QVP") are Delaware limited partnerships, and Defendant, Quad Ventures, LLC ("QV"), is a Delaware limited liability company (collectively, "Quad"), which all have their principal place of business in New York, NY that either owned or controlled Troll  and, during the period from April 17, 2002 through May 16, 2003, either through itself or a  member, officer, employee or representative of Quad, held and controlled seats on Troll's board of directors and/or managers.

15.     The above-named defendants are "insiders" of the debtors as that term is defined in 28 U.S.C. §101(31).

## FACTUAL BACKGROUND

16.     Troll was a publisher and direct marketer of books and educational products that serviced grades Pre-K through 9.  Troll distributed its products through multiple channels, including school book clubs, home continuity programs, a school library catalog, and retailers.

17.     As of June 30, 2001, according to the consolidated financial statements prepared on a "going concern basis" by Ernst & Young ("E&Y") for Troll and its Subsidiaries, Troll had a working capital deficit of approximately $16 million and a members' deficiency of approximately $55 million.

18.    In addition, Troll's existing revolving credit agreement with Fleet Capital

Corporation ("Fleet") was to expire on March 31, 2002.  Under this agreement, Fleet provided

Troll with a revolving credit line of up to $19,500,000, through October 31, 2001, and

$14,500,000 thereafter through maturity.  Troll was required to make such payments as were

necessary to bring the revolving credit facility below $14.5 million by October 31, 2001 and to

cause all but $250,000 of accounts payable to be paid within 90 days as of June 30 of each year.

As of June 30, 2001 and 2000, $10,367,635 and $7,071,140, respectively, were outstanding

under the agreement.

19.    Troll was advised that it would be unable to pay all existing obligations if it did

not obtain alternative sources of capital.  E&Y could not assure Troll that such alternative

strategic actions including a merger, sale, equity infusion or recapitalization would be successful.

As E&Y noted in its report of independent auditors, "with these uncertainties, there is

'substantial doubt' about the Company's ability to continue as going concern."

20.  Defendant Quad Ventures, LLC, ("QV") through its subsidiary Defendant Quad

Venture Partners SBIC, LLP, ("QVP SBIC") acquired a 90% equity interest in Troll on April 17,

2002.  The acquisition was made through an Agreement and Plan of Merger dated March 22,

2002, pursuant to which  the owners of Communications holding a 100% membership interest

sold their entire interest to Holdings which resulted in the shareholders of Holdings acquiring

100% of Communications membership interests.   Holdings formed Troll NewCo, LLC

("NewCo"), a Delaware limited liability company for the purpose of holding the equity in

Communications which in turn held the equity in Subsidiaries.  NewCo merged with and into

Communications, such that all of the existing membership interests of Communications were

canceled, and the surviving membership interests were those of NewCo and Holdings was the

6

100% surviving member of Communications.  As part of the transaction, Holdings issued stock

to QVP SBIC  and to the former owners of Communications, Willis Stein & Partners II, L.P. and

Willis Stein & Partners Dutch, L.P. (collectively "Willis Stein") such that QVP SBIC owned

approximately 90% of Holdings' issued and outstanding shares and Willis Stein owned 10% of

Holdings' issued and outstanding shares.  Holdings in turn was the 100% owner of

Communications which was the entity through which the debtors operated their business.

21.    QVP SBIC, through Holdings, acquired its interest in Troll in exchange for a

payment of approximately $4.4 million, including transaction costs and the consideration paid to

Willis Stein.   As part of the deal, Willis Stein forgave approximately $38.5 million in

subordinated debt.   Willis Stein received (a) its 10% interest in Holdings (valued at that time by

the parties at $555,556);  (b)  a new $1 million subordinated note due to be repaid in April, 2007,

and (c) $1 million in cash.

22.    Even adjusting for the cancellation of the Willis Stein debt, Communications' net

asset value was a negative $12.7 million when it was purchased by Holdings.   This transaction

was accounted for using the purchase method of accounting.  Therefore, the cost to acquire

Communications was allocated to the assets acquired and liabilities assumed based on their

respective fair values, with the excess recorded as substantial goodwill, an intangible asset.

Because the net assets value was negative $12.7 million, and Holdings paid approximately $4.4

million, there was an excess purchase price of approximately $17 million all of which was

recorded as goodwill.

23.    On April 17, 2002, as part of the transaction, QV entered into

a management consulting agreement with Holdings to pay QV for prior consulting work in

connection with Quad's acquisition of Troll and to provide consulting and other advice to Troll

7

on an on-going basis.

24.     Additionally, on April 17, 2002, as a part of this transaction, Communications and PNC Bank, N.A. ("PNC") entered into a revolving credit and security facility, secured by Troll's inventory and accounts receivable, whereby PNC made available a $15 million line of credit to Communications, which was to expire on April 17, 2005.

25.     On June 30, 2002, according to the consolidated financial statements, as prepared by PricewaterhouseCoopers ("PWC"), covering the three month period of Quad's ownership of Troll, PWC determined that there was "substantial doubt about Troll's ability to continue as a going concern."  Additionally, PWC indicated, in the notes included with the consolidated financial statements, that Troll was in default on its credit facility with PNC because Troll violated the tangible net worth covenant contained in the credit agreement.

26.     According to Troll's internal financial statements, as of June 30, 2002, Communications' accounts payable and other liabilities were $13.8 million.  The tangible net worth of Communications was valued at a negative $13.1 million.  The going concern business qualification given by PWC rendered the company's goodwill valueless, making tangible net worth the guidepost for determining the company's solvency.  By this standard, and by the standard of the company's cash flow, Troll was insolvent on June 30, 2002.  During this brief period of Quad's ownership, Communications sales were $4.1 million with losses at $2.8 million.  Thus, Troll incurred a loss of 70% on each sales dollar during this period.  Troll suffered from a severe liquidity crisis at this time.  Troll had only 16 cents of cash and receivables to cover each dollar of then-current liability.  The acceptable standard is a 1:1 ratio. Working Capital a key measure of financial strength and the ability of Troll to meet its obligations in a prompt manner was a deficit $10.6 million on June 30, 2003.  Troll was never

8

able to climb out of its insolvency right through the time it filed its bankruptcy petition. Additional funds were provided by its shareholders, but those funds could only be used to cover some of the company's losses, they were not sufficient to make the company solvent.

27.    At this point, Troll's board of directors and/or managers should have taken drastic steps in protecting Troll's existing assets and reverse these staggering losses and liabilities, found ways to add/infuse substantial new capital into Troll's operations, retained crisis/management professionals or simply shutdown Troll's operations.

28.    Instead, Quad loaned approximately $5.4 million to Troll,  evidenced by seven subordinated notes, convertible at the option of Quad.  The loan proceeds were purportedly used to fund Troll's operations.

29.    On August 20, 2002, pursuant to a common stock purchase agreement, between Troll and Quad, approximately $1.5 million of this debt was converted into equity (in exchange for 27,000 shares Class A common stock in Holdings).

30.    On September 9, 2002, pursuant to a note and warrant purchase agreement, by and between Troll and Quad, Troll issued a new subordinated note of $4 million and stock warrants valued at $10,000.00 to Quad.  In exchange, Quad canceled the outstanding subordinated notes of $3.9 million.

31.    On September 23, 2002, pursuant to a securities purchase agreement, Troll issued equity (145,151 shares of Class D common stock in Holdings) to LLR in exchange for payment (equity financing) of $7.5 million.  As a result, LLR bought a minority ownership position in Troll and Quad retained control of Troll's board of directors and/or managers.  Defendants, Lehr and Perricelli were added to Holdings' board of directors as a result of this transaction.

32.    Also, on the same day, Troll entered into an amended and restated management

9

consulting agreement with Quad and a separate management consulting agreement with LLR. The cash proceeds from the equity transaction with LLR were used to pay Quad for the $4 million subordinated note plus interest ($22,591.27), totaling $4,022,591.27, pay alleged management consulting fees to Quad in the amount of $154,662.00, and pay alleged reimbursement of expenses to Quad in the amount of $134,694.04.

33.    As of September 30, 2002, five months after Quad's ownership, Troll's net sales were $8.2 million with losses of $3.2 million.  EBITDA was a negative $2.6 million meaning that Troll could not cover critical payments such as interest, loan payments, and taxes. Furthermore, not only was Troll's cash flow negative, but accounts payable and other current liabilities dramatically increased to $22 million, up from $13.8 million, as of June 30, 2002. Troll's overall performance during this period shows that sales were $11 million generating losses of $6 million. At this point, Troll was losing over $.50 cents on every dollar of product it sold.  Thus, not only was Troll clearly insolvent, but its current liabilities had increased almost $10 million from June 30, 2002.  Despite having this overwhelming and material financial data at its disposal, Troll's board of directors and/or managers continued to take no action in protecting the interests of its unsecured creditors.

34.    During the first quarter of fiscal year 2003, Troll lost money faster than its shareholders could replace it and the capital infusion from the LLR transaction was used to fund losses and pay down bank debt to the detriment of Troll's unsecured creditors.  Troll incurred additional substantial  losses of over $10 million which was triple the amount of its losses as of September 30, 2002 ($3.2 million).

35.    To assist Troll in preparing its tax returns and auditing the financial statements of its 401(k) plan, Troll retained the accounting firm of Leaf, Saltzman, Manganelli, Pfeil &

Tendler LLP ("Leaf Saltzman").  On December 12, 2002, Leaf Saltzman issued a letter to Troll's board of managers stating that its books and records were incomplete for the periods ending April 16, 2002 and June 30, 2002, and that they may be unable to complete the necessary tax returns by December 15, 2003.  Also, due to the unavailability of its books and records, Leaf Saltzman indicated that it was unable to assure the completeness of the 401(k) participants' data. Troll management is responsible for maintaining the completeness of its books and records.

36.    By December 31, 2002, Troll's net sales were $22 million, down $7 million from the prior year, and its losses were $7.1 million, indicating that losses were continuing at a steady, alarming rate in the second quarter of 2002.  EBITDA during this time period was a negative $4.4 million.

37.    In addition, for the first time, Troll's cash reserves appeared on accounts receivable and inventory.  There was a 25% cash reserve for bad debts and returns on accounts receivable, and 20% cash reserve for obsolescence on inventory.  These assets were overstated in the prior financial statements worsening the overall condition of Troll.

38.    Also, accounts payable and other current liabilities declined to $18.8 million although there was an increase in non-current liabilities of $2.6 million which cannot be explained by Troll's financial statements.

39.    Furthermore, Troll's bank debt increased by $3 million to $10.9 million and was partially used to fund losses and reduce trade debt.

40.    Moreover, according to Troll's financial statements covering this time period, Troll's equity was rearranged  for the third time during the three quarters of 2002.  For example, $600,000 shares of Holdings' common stock was sold bringing in new cash to purportedly fund Troll's operations.

11

41.     On January 23, 2003, LLR and Quad entered into a mezzanine credit agreement to
provide Troll with $4 million of additional capital.  Quad provided half of the initial $2 million
advance to Troll.  However, in Troll's financial condition, a capital infusion of approximately
$12 million was necessary to reduce the bank and trade debts, and provide for the payment of
taxes, with additional financing needed during the Summer months until Troll's cyclically strong
period commenced in the Fall.

42.     On January 31, 2003, Troll's reported losses for the month were $1.5 million on
sales of $3.7 million.  Additionally, another $1.5 million in negative EBITDA was generated.

43.     Although accounts payable and other current liabilities were stable at $18.3
million, non-current liabilities increased over $1 million.  Cash reserves for bad debts and
inventory obsolescence increased 5%.

44.     On February 12, 2003, Troll and Scholastic, Inc. entered into a first sales contract
for the purchase of substantially all of  Troll's assets. Pepper Hamilton LLP was retained to
handle this sales transaction.

45.     In early March, 2003, Troll retained Phoenix Management Services ("Phoenix")
to review its operations and advise on the overall financial condition of Troll.

46.     On April 3, 2003, Phoenix delivered a cash forecast report indicating the
following: (a) a dramatic scaling was required for survival, (b) that trade vendors were unpaid
and stressed,   (c) the existence of a continued cash burn, (d) the existence of excessive inventory
levels, (e) that corporate management needed crisis management and restructuring support, and
(f) that corporate restructing probably needs to be done inside a chapter 11 proceeding.

47.     On April 18, 2003, Troll's Fall 2003 production plan called for moving away

12

from certain vendors where there are payment (credit hold) problems.

48.     On April 29, 2003, Phoenix presented Troll with three likely outcomes resulting from Troll seeking chapter 11 bankruptcy protection including: (i) the liquidation of the business part of a liquidating chapter 11, (ii) the sale of all, or substantially all of the Company's assets in conjunction with §363 of the Bankruptcy Code, or (iii) the filing of a plan of reorganization under chapter 11.  Even under a liquidation analysis, PNC would be the only recovering party receiving approximately $2 million of an estimated $12 million debt.

49.     On May 16, 2003, Troll filed for protection under chapter 11 of the Bankruptcy Code with this Court.

50.     During the period from at least June 30, 2002 until the Petition Date, Troll was insolvent ("Relevant Insolvency Period").

51.     Knowing that Troll was insolvent, the Defendants caused Troll to incur substantial amounts of additional bank and trade debt.  The Defendants knew or should have known that there was no realistic prospect of repaying these debts.

52.     During the Relevant Insolvency Period, Troll was not adequately capitalized in order to obtain financing from traditional lending sources.

53.     During the Relevant Insolvency Period, the Defendants either explicitly agreed or acquiesced to Quad's (and as of September 23, 2002- LLR's) dominion and control of Troll's board of directors and/or managers in derogation of their fiduciary duties to Troll and its unsecured creditors.

## COUNT ONE

## BREACHES OF FIDUCIARY DUTIES

### Plaintiff v. Lincoln E. Frank, Andrew E. Kaplan, Peter E. Bergen, Daniel Neuwirth, Curtis Thompson, Jeffrey Lucking, Terry Tuttle, Seth J. Lehr, Scott Perricelli

54.     Plaintiff repeats and realleges each allegation contained in preceding paragraphs as if fully set forth herein.

55.     As officers and/or members of the board of managers of Communications, Frank, Kaplan, Neuwirth, Bergen, Thompson, Lucking and  Tuttle owed fiduciary duties to the unsecured creditors of Communications during the Relevant Insolvency Period.  Although the plaintiff herein alleges that Troll was insolvent during this time period, these fiduciary duties applied even if Troll was only in the "zone of insolvency."

56.      As the officers and/or directors of Holdings, which in turn owned 100% of the membership interests in Communications, Frank, Kaplan, Lehr, Pericelli and Bergen owed fiduciary duties to the unsecured creditors of Communications during the Relevant Insolvency Period.  Although the plaintiff herein alleges that Troll was insolvent during this time period, these fiduciary duties applied even if Troll was only in the "zone of insolvency."

57.      From Quad's purchase of Troll until LLR's purchase of Holdings stock, the Quad partners, Frank, Kaplan and Neuwirth had complete control over and directed the policies and affairs of Troll.  Through their domination and control of Troll's board of directors and/or managers, Frank, Kaplan and Neuwirth caused Troll to act primarily in the interests of Quad and ultimately to the detriment of its unsecured creditors.   Frank, Kaplan and Neuwirth were not disinterested.  Through Quad, they had invested large sums of money in Troll, characterized as both debt and equity, and had a vested interest in keeping Troll going for as long as possible to

recover as much of their investment as possible, even at the expense of Troll's creditors.  Frank,

Kaplan and Neuwirth also had a professional reputation to uphold which precluded an honest

and good faith assessment of Troll's continued viability as a going concern.

58.    Upon LLR's purchase of Holdings stock, Lehr and Pericelli joined Frank, Kaplan

and Neuwirth in controlling and directing the policies and affairs of Troll.  Lehr and Pericelli

also had a personal and professional  interest in artificially extending Troll's corporate existence

to recoup as much of their equity investment as possible, irrespective of the harm such extension

caused to Troll's creditors.

59.    As the only other director of Holdings and manager of Communications, Bergen,

who was hired by Frank, Kaplan and Neuwirth, was beholden to their interests and lacked

independence.

60.    Bergen, Lucking, Thompson and Tuttle were officers of Communications during

the Relevant Insolvency Period and were likewise beholden to Frank, Kaplan and Neuwirth and

therefore lacked independence in managing the affairs of the debtors.   During each officer's

respective tenure, he aided and abetted Frank, Kaplan, Neuwirth, Lehr and Pericelli in the

conduct complained of herein by executing corporate policy that he knew, or should have

known, was detrimental to the interests of the debtors' creditors.

61.    Defendants Frank, Kaplan, Neuwirth and Bergen breached their fiduciary duty of

loyalty to Communication's creditors by authorizing the distribution of the proceeds of LLR's

equity buy-in to QVP ostensibly to pay off a subordinated promissory note as well as sums due

to QVP under a consulting agreement with Holdings.   The controlling directors, Frank, Kaplan

and Neuwirth were on both sides of this transaction and therefore must prove that the use of

these funds to pay off subordinated insider debt was entirely fair to Communication's unsecured

creditors.   Bergen was beholden to Frank, Kaplan and Neuwirth and failed to undertake an

independent and good faith review of the merits of using the cash influx to pay off this insider

debt at a time when Troll was unable to earn enough money from its sales to fund current

operations.

62.    The use of these funds to pay off the Quad debt left Communications with

unreasonably small capital, thereby impairing the ability of the unsecured creditors of

Communications to be repaid.

63.    The defendants further breached their fiduciary duties to the creditors of

Communications by failing to take prompt corrective action in the face of Communication's

rapidly declining financial situation.   As previously stated, the controlling parties, Frank, Kaplan

and Neuwirth and later also Lehr and Pericelli, were not disinterested.  By virtue of their

personal economic interests and professional reputations, they had a direct stake in keeping Troll

going for as along as possible, regardless of the consequences to Communications' unsecured

creditors.  Beginning on June 30, 2002 when they received the on-going business qualification

from PWC, through the time that the defendants actually commenced liquidation proceedings in

February of 2003, the defendants, both those in control and the other defendants who were

beholden to them, should have taken immediate corrective action to protect the interests of the

unsecured creditors including, without limitation, the retention of financial advisors specializing

in distressed companies and the commencement of liquidation proceedings.

64.    By failing to take such prompt actions, the defendants caused the corporate life of

the debtors to be artificially extended beyond the point of economic viability.  As a direct

consequence, Communications' unsecured creditors sustained direct and foreseeable damage in

that amount of claims and liabilities of the debtors have increased substantially from June 30,

16

2002 through the petition date.  As of June 30, 2002, Communications had trade debt of

approximately $13.8 million.  It is expected that the total amount of unsecured claims to be

administered in the debtors' estates will be at least $18.8 million and could run as high as $22

million.  Accordingly, due to the artificial extension of the debtors' corporate life, the trade debt

has increased by the sum of at least $5 million and possibly more, which is a real and direct

damage to Communications' creditors.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of

the Plaintiff, for the benefit of Troll's unsecured creditors, and against the Defendants, Lincoln

E. Frank, Andrew E. Kaplan, Peter E. Bergen, Daniel Neuwirth, Curtis Thompson, Jeffrey

Lucking, Terry Tuttle, Seth J. Lehr, Scott Perricelli, jointly and severally, in such amount as the

plaintiff proves at trial, together with pre- and post-judgment interest at the legal rate and the

costs of this action, and granting such other relief as the Court finds just and proper.

## COUNT TWO

## AVOIDANCE OF FRAUDULENT TRANSFERS
### (Pursuant to Bankruptcy Code §544(b), §550, §551 and 6 Del. C. §1305(b))

### Plaintiff v. QVP

65.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth

herein.

66.    On September 24, 2002, Troll transferred $4,022,591.27, representing an alleged

repayment of an outstanding subordinated promissory note obligation to or for the benefit of

Defendant QVP.

67.    On September 24, 2002, Troll transferred $154,662.00, as an alleged payment of

management consulting fees to or for the benefit of Defendant QVP.

68.     On February 26, 2003, Troll transferred $134,694.04, as an alleged payment for reimbursement of expenses to or for the benefit of Defendant QVP.

69.     Defendant QVP was the initial transferee of the foregoing transfers and/or the entity for whose benefit such transfers were made.

70.     The foregoing transfers consisted of payments directed by Frank, Kaplan and Neuwirth who were the controlling persons and insiders of both QVP and Troll.

71.     Unsecured creditors of the debtors' estates exist whose allowable claims arose before the aforementioned transfers.

72.     The aforementioned transfers were made to QVP on account of antecedent debts owed by Troll to QVP.

73.     Troll was insolvent at the time of the aforementioned transfers and QVP knew or had reasonable cause to believe that Troll was insolvent.

74.     QVP is an "insider" of Troll as that term is defined in 6 Del. C. §1301(7).

75.     Under §544(b) of the Bankruptcy Code and 6 Del. C. §1305(b), the aforementioned transfers are avoidable by the Plaintiff, and under §550 are recoverable by the Plaintiff from QVP.

WHEREFORE, Plaintiff respectfully requests that the Court:

a.     Issue an order avoiding the foregoing transfers as fraudulent transfers;

b.     Compel Defendant QVP to disgorge and pay over for the benefit of the unsecured creditors of Troll, all consideration or the monetary value of all consideration received by Defendant QVP in connection with the foregoing transfers;

c.     Grant such other further relief as this Court deems just and proper.

## COUNT THREE

## AVOIDANCE OF PREFERENTIAL TRANSFERS
### (Pursuant to Bankruptcy Code §§547(B), 550, and 551)

### Plaintiff v. QVP

76.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

77.    On September 24, 2002, Troll transferred $4,022,591.27, representing an alleged repayment of an outstanding promissory note obligation due or for the benefit of Defendant QVP.

78.    On September 24, 2002, Troll transferred $154,662.00, as an alleged payment of management consulting fees to or for the benefit of Defendant QVP.

79.    On February 26, 2003, Troll transferred $134,694.04, as an alleged payment for reimbursement of expenses to or for the benefit of Defendant Quad.

80.    The foregoing transfers all occurred within one year of the Petition Date.

81.    At all relevant times hereto, Defendant QVP was an "insider" as that term is defined in 28 U.S.C. §101 of the Bankruptcy Code.

82.    The foregoing transfers enabled Defendant QVP  to receive more than it would have received if: (a) the transfers had not been made, (b) the case were a case under chapter 7 of the Bankruptcy Code, and (c) Defendant QVP received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

83.    Each of the foregoing transfers were transfers by Troll of property to or for the benefit of a creditor, made on account of an antecedent debt owed by Troll prior to the date of such transfers.

19

84.     Each of the foregoing transfers was made while Troll was insolvent.

85.     Defendant QVP was the initial transferee of the foregoing transfers and/or the entity for whose benefit the transfers were made.

86.      By reason of the foregoing, Plaintiff on behalf of the Troll bankruptcy estates, is entitled to a judgment avoiding, recovering, and preserving for the benefit of Troll's bankruptcy estates the foregoing transfers or the value thereof.

WHEREFORE, Plaintiff respectfully requests that the Court:

b.      Issue an order avoiding the foregoing transfers as preferences;

c.      Compel the Defendant QVP to disgorge and pay over for the benefit of the unsecured creditors of Troll, all consideration or the monetary value of all consideration received by Defendant Quad in connection with the foregoing transfers;

d.      Disallowing any claim of Defendant QVP against Troll pursuant to 11 U.S.C. §502(d) of the Bankruptcy Code; and

e.      Grant such other further relief as this Court deems just and proper.


## COUNT FOUR

### AVOIDANCE OF FRAUDULENT  TRANSFERS
**(Pursuant to Bankruptcy Code §§544, 548, 550, and 551 and 6 Del. C. §1304)**

### Plaintiff v. QVP

87.     Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

88.     On September 24, 2002, Troll transferred $4,022,591.27, representing an alleged repayment of an outstanding subordinated promissory note obligation due or for the benefit of

Defendant QVP.

89.     At the time of this transfer, Troll was insolvent or became insolvent as a result of such transfer.

90.     The transfer occurred within one year of the Petition Date.

91.      At all relevant times hereto, Defendant QVP was an "insider" as that term is defined in 28 U.S.C. §101 of the Bankruptcy Code and 6 Del. C. §1301.

92.      The debtor received less than reasonably equivalent value in exchange for the above referenced transfers within the meaning of 11 U.S.C. Section 548(a)(1)(B) and 6 Del. C. §1304(a)(2).

93.     By reason of the foregoing, Plaintiff on behalf of the Troll bankruptcy estates, is entitled to a judgment avoiding, recovering, and preserving for the benefit of Troll's bankruptcy estates the foregoing transfer or the value thereof.

WHEREFORE, Plaintiff respectfully requests that the Court:

a.     Issue an order avoiding the foregoing transfer as a fraudulent transfer;

b.     Compel the Defendant QVP to disgorge and pay over for the benefit of the unsecured creditors of Troll, all consideration or the monetary value of all consideration received by Defendant QVP in connection with the foregoing transfers;

c.     Disallowing any claim of Defendant QVP against Troll pursuant to 11 U.S.C. §502(d) of the Bankruptcy Code; and

d.     Grant such other further relief as this Court deems just and proper.

Dated: October 7, 2005
Wilmington, Delaware

FERRY, JOSEPH & PEARCE, P.A.


/s/ Jason C. Powell
Rick S. Miller (No. 3418)
Jason C. Powell (No. 3768)
824 Market Street, Suite 904
Wilmington, DE 19801
(302) 575-1555

Counsel for Plaintiff, Michael B. Joseph,
as Chapter 7 Trustee

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing First Amended Complaint was served on October 7, 2005 upon the following persons in the manner indicated:

**By hand:**

Laura Davis Jones, Esquire
James E. O'Neill, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
919 N. Market Street
Wilmington, DE 19801

Michael R. Lastowski, Esquire
Christopher M. Winter, Esquire
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, DE 19801

**By first class mail:**

Michael T. Hannafan, Esquire
Blake T. Hannafan, Esquire
Michael T. Hannafan & Assocs., Ltd.
One East Wacker Drive, Suite 1208
Chicago IL 60601

David T. Sykes, Esquire
Christopher Redd, Esquire
Duane Morris LLP
One Liberty Place
Philadelphia PA 19103-7396

James C. Joslin, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago IL 60601

William H. Schorling, Esquire
Klett Rooney Lieber & Schorling
Two Logan Square, 12th Floor
Philadelphia PA 19103

At penalty of perjury, I declare the foregoing is true and correct.

/s/Rick S. Miller
Rick S. Miller (#3418)